United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COREMETRICS, INC., a Delaware corporation,

Plaintiff,

v.

ATOMIC PARK.COM, LLC, a/k/a ATOMICPARK.COM, and DOES 1 though 20, inclusive,

Defendants.

_______________________________________/

No. C-04-0222 EMC

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION**
**(Docket No. 8)**

Plaintiff Coremetrics, Inc. ("Coremetrics") filed suit against Defendant AtomicPark.com LLC ("AtomicPark") in state court, asserting claims for (1) breach of written contract, (2) fraud, (3) concealment and suppression of facts, (4) accounted stated, (5) open book account, and (6) quantum meruit. Subsequently, AtomicPark removed the case to federal court on the basis of diversity jurisdiction. AtomicPark then filed a motion to dismiss the case for lack of personal jurisdiction. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby DENIES the motion to dismiss.

## I. FACTUAL & PROCEDURAL BACKGROUND

Coremetrics is a Delaware corporation that transacts business in California. *See* Compl. ¶ 1. It helps companies increase their e-business by capturing and analyzing all online visitor and customer interactions. *See* Compl. ¶ 1; *see also* Resnick Decl. ¶ 2 ("Coremetrics is an online

marketing analytics platform that captures visitor clickstream and purchase activity on our clients' websites in specialized data collection servers.").

AtomicPark is a Wisconsin LLC. *See* Compl. ¶ 8. It is "a software e-tailer, which essentially means [it is] a retailer on line and [it] primarily sell[s] software to both businesses and consumers." Farrer Decl., Ex. H at 5 (Boldin deposition). On or about September 26, 2002, AtomicPark hired Coremetrics to provide professional services in connection with analyzing and making recommendations for improving AtomicPark's website. *See* Compl. ¶ 8. Coremetrics and AtomicPark signed a MarketForce Services Agreement. *See id.* & Ex. A. Thereafter, Coremetrics sent an invoice to AtomicPark for $29,000 – constituting initial service and implementation fees – and provided its services to AtomicPark. *See id.* ¶¶ 8, 10.

On or about September 16, 2003, Coremetrics sent a demand letter to AtomicPark for payment of the $29,000 invoice. *See id.* ¶ 11. AtomicPark, however, did not pay. *See id.* On or about October 15, 2003, Plaintiff invoiced AtomicPark for the total amount due under the Agreement – a total of $103,812.60 (including the $29,000 for the first invoice and interest that had accrued). *See id.* ¶ 12. Once again, AtomicPark did not pay.

Subsequently, Coremetrics sued AtomicPark for (1) breach of written contract, (2) fraud, (3) concealment and suppression of facts, (4) accounted stated, (5) open book account, and (6) quantum meruit.

## II. DISCUSSION

### A. Legal Standard

In its motion, AtomicPark argues that this case should be dismissed because the Court does not have general jurisdiction over AtomicPark. Federal Rule of Civil Procedure 12(b)(2) governs dismissal for lack of personal jurisdiction. *See Doe v. Unocal Corp.*, 248 F.3d 915, 921 (9th Cir. 2001). Coremetrics, as the plaintiff in this case, has the burden of establishing that the Court has personal jurisdiction. *See id.* at 922. However, "'when a district court acts on a defendant's motion to dismiss without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss. That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant.'" *Id.*; *see also AT&T v.*

*Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (stating that, where trial court rules on jurisdictional issue based on affidavits and discovery materials without holding evidentiary hearing, plaintiff need only make prima facie showing).[1] "Where not directly controverted, plaintiff's version of the facts is taken as true for the purposes of a 12(b)(2) motion to dismiss. Likewise, 'conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiffs'] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.'" *Id.*; *see also Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (stating that "plaintiff cannot 'simply rest on the bare allegations of its complaint' [but that] uncontroverted allegations in the complaint must be taken as true" and "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor").

B. General Jurisdiction

Where there is no applicable federal statute governing personal jurisdiction, a court applies the law of the state in which the district court sits. *See Schwarzenegger*, 374 F.3d at 800. "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same. For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum

---

[1] In *Data Disc, Inc. v. Systems Technology Assocs., Inc.*, 557 F.2d 1280 (9th Cir. 1977), the Ninth Circuit explained that no greater burden of proof was necessary for the following reason:

> If the court determines that it will receive only affidavits or affidavits plus discovery materials, these very limitations dictate that a plaintiff must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss. Any greater burden – such as proof by a preponderance of the evidence – would permit a defendant to obtain a dismissal simply by controverting the facts established by a plaintiff through his own affidavits and supporting materials. Thus a plaintiff could not meet a burden of proof requiring a preponderance of the evidence without going beyond the written materials. Accordingly, if a plaintiff's proof is limited to written materials, it is necessary only for these materials to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss.

*Id.* at 1285.

United States District Court
For the Northern District of California

contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"[2] *Id.* at 800-01.

There are two kinds of personal jurisdiction: general jurisdiction and specific jurisdiction. In its motion to dismiss, AtomicPark argues that this Court has neither general nor specific jurisdiction over it. In its opposition, Coremetrics only argues that this Court has general jurisdiction.[3]

"General jurisdiction refers to jurisdiction to adjudicate claims that do not arise from the defendant's contacts with the forum state. Thus, if a defendant is amenable to general jurisdiction in a state, the state may exercise jurisdiction over the defendant based on any claim, including claims unrelated to the defendant's contacts with the state." 16-108 Moore's Fed. Prac. -- Civ. § 108.40; *see also Synopsys, Inc. v. Ricoh Co., Ltd.*, 343 F. Supp. 2d 883, 886 (N.D. Cal. 2003) (noting the same regarding general jurisdiction).

For general jurisdiction to exist over a defendant, the defendant must engage in "substantial" or "continuous and systematic" contacts that approximate physical presence in the forum state.[4] *See*

---

[2] The agreement between Coremetrics and AtomicPark provided that New York law should apply "without giving effect to its conflict of laws principles." Compl., Ex. A. Neither party has made any argument, however, that New York's long-arm statute should control instead of California's.

[3] After the parties' original briefing was completed, the motion was held in abeyance to await the Ninth Circuit's en banc decision in *Gator.com Corp. v. L.L. Bean, Inc.*, 341 F.3d 1072 (9th Cir. 2003), *vacated by* 366 F.3d 789 (9th Cir. 2004). On February 15, 2005, the Ninth Circuit issued its en banc decision, which dismissed the case as moot. *See Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125 (9th Cir. 2005). Subsequently, the Court instructed the parties to file supplemental briefs in light of the passage of time since the original briefing was finished. In its supplemental brief, Coremetrics argued for the first time that this Court has specific jurisdiction over AtomicPark. As the Court stated in its order of May 11, 2005, *see* Docket No. 44, this ground was not timely raised and will not be considered.

[4] The Ninth Circuit has framed this test both in disjunctive terms (*i.e.*, substantial *or* continuous and systematic) and in conjunctive terms (*i.e.*, substantial, continuous, *and* systematic). *Compare Easter v. Am. West Fin.*, 381 F.3d 948, 960 (9th Cir. 2004) ("A defendant is subject to general jurisdiction only where the defendant's contacts with a forum are 'substantial' or 'continuous and systematic.'"), *with Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002) ("[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum.").

Evidently, the precise formulation of these two requirements is immaterial. What is important is that the continuous contact be "substantial" enough to satisfy due process. *See International Shoe v. Washington*, 326 U.S. 310, 318 (1945) ("While it has been held . . . that continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity, there have been instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action

United States District Court
For the Northern District of California

*Schwarzenegger*, 374 F.3d at 801; *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). "This is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Schwarzenegger*, 374 F.3d at 801.

The Ninth Circuit has stated that, when a court determines whether or not there is general jurisdiction over a defendant, "[f]actors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft*, 223 F.3d at 1086; *see also Lehigh Coal & Navigation Co. v. Geko-Mayo, GMBH*, 56 F. Supp. 2d 559, 572 (E.D. Pa. 1999) (noting that solicitation of business aimed at forum state is considered in general jurisdiction analysis in addition to factors such as "the percentage of its revenue the non-resident [defendant] derived for sales within the forum, the number of sales made by the non-resident [defendant] in the forum, and whether the solicitation is regularly conducted and specifically targeted at the forum market"). A court, however, should "focus upon the 'economic reality' of [a defendant's] activities rather than a mechanical checklist." *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984).

Finally, even if a court concludes that substantial, or continuous and systematic, contacts exist, the assertion of general jurisdiction must still be reasonable. *See Amoco Egypt Oil Co. v. Leonis Navigation Co.*, Inc., 1 F.3d 848, 852-53 (9th Cir. 1993).

C. <u>AtomicPark's Contacts with California</u>

In the instant case, Coremetrics contends that the Court does have general jurisdiction over AtomicPark based on the following contacts.

(1) AtomicPark's highly interactive website, which is the means by which AtomicPark sells its products and which is accessible to California consumers. *See* Supp. Farrer Decl. ¶ 2 & Exs. A-B (noting that, to purchase software from AtomicPark, customer must set up an account and provide AtomicPark with name, address, telephone number, credit card payment

---

arising from dealings entirely distinct from those activities.").

United States District Court

For the Northern District of California

information, and billing and shipping addresses; adding that, after a purchase is made, AtomicPark sends e-mails to customer, one thanking customer for registration with AtomicPark, another thanking customer for order, and yet another providing customer with order tracking information and order confirmation number).

(2) AtomicPark's sales to California consumers, which from April 2003 to February 2004 was in excess of $3.3 million, or 14.71 percent of its total sales. According to AtomicPark's president, 14.71 percent is a representative percentage of sales to California from year to year, from 1999 to 2002.[5]  *See* Farrer Decl., Ex. F at 10 (Boldin deposition) ("I have nothing to believe that it would be very different from year to year; percentage wise, that is.").

(3) AtomicPark's advertising of its services through the Internet search engine Yahoo.  *See* Farrer Decl., Ex. G (agreement under which Yahoo provides service called "Product Submit" to AtomicPark, which "enables Advertiser to submit its product information . . . for consideration of inclusion in a Yahoo database that may be searched"); *id.*, Ex. H at 20-21 (Boldin deposition).  Yahoo has its principal place of business in California.

(4) AtomicPark's advertising of its services through other Internet websites, including Price.com, CNET websites, and PriceGrabber.com.  *See id.*, Ex. G (agreements).  Under the agreements with the third parties, the cost of advertising is not insignificant.  *See, e.g.*, Price.com (month-to-month contract under which cost of advertising is one-time set-up fee of $1,000 plus $0.85 per clickthrough, for monthly minimum of $1,500); CNET websites

---

[5] AtomicPark has offered a supplemental declaration from its president, Mr. Boldin, to take the sting away from this $3.3 million figure.  In his supplemental declaration, Mr. Boldin states that, even though there were sales in this amount, "there are significant costs included in the distribution system, in addition to the cost of the software itself, before AtomicPark realizes any revenue."  Supp. Boldin Decl. ¶ 2.  Mr. Boldin continues: "AtomicPark's *net* margin on its software sales range between one and two percent.  Thus, AtomicPark's *net* revenue from the sales to Californians during the time period described was in the range of $30,000 to $60,000."  *Id.* (emphasis added).

AtomicPark, however, has not provided any authority to this Court demonstrating that it is a defendant's *profits* from sales that must be considered instead of a defendant's sales as a whole.  *See Bancroft*, 223 F.3d at 1086 (stating that "[f]actors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there").  Indeed, so far as this Court is aware no court has parsed out profits from sales.  As a policy matter, any such inquiry would mandate extensive fact-intensive discovery into costs, overhead, and other factors that would inform profits, an inquiry which would inappropriately front-load extensive discovery and fact determination.

United States District Court
For the Northern District of California

(five-year contract under which cost of advertising is $0.75 per clickthrough, plus at least $60,000 per month for advertising promotions); PriceGrabber.com (contract providing for three-month advertising campaign at cost of $12,500 per month plus clickthrough fee). Price.com and PriceGrabber.com both appear to have offices in California.

(5) AtomicPark's purchases of products from California vendors, which between June 1, 2003, and May 31, 2004, were in excess of $1 million (approximately 5.1 percent of its total purchases).[6] *See id.* ¶ 6 & Ex. I.

(6) The four Internet advertising agreements entered into between AtomicPark and third parties (*i.e.*, Yahoo, Price.com, CNET, and PriceGrabber.com) under which AtomicPark agreed to personal jurisdiction in California and/or application of California law.[7] *See id.*, Ex. G (agreements).

---

[6] In his supplemental declaration, Mr. Boldin claims that

> AtomicPark purchases all of the software that it sells from wholesale distributors, and not directly from the software manufacturers, with one exception . . . . As virtually all software is purchased through wholesales AtomicPark has very little, if any, direct contact with any of the manufacturers of the software that it sells, including the manufacturers identified in Mr. Farrer's [supplemental] declaration as 'California' manufacturers. In fact, in order to satisfy software orders placed through its website, AtomicPark utilizes software distribution centers located at sites located as close as possible to AtomicPark's headquarters in Wisconsin in order to reduce shipping costs and improve delivery time. Thus, it is my best estimate that between 95 percent and 98 percent of the software delivered into AtomicPark's warehouse in Wisconsin for distribution to purchasers, has a point of origin outside the State of California, regardless of where the manufacturer of the software is headquartered.

Supp. Boldin Decl. ¶ 4. This statement, however, is not enough to overcome the evidence that AtomicPark supplied to Coremetrics, stating that its purchases of products from California vendors -- whether software products and/or other products -- totaled some $1 million from June 2003 through May 2004. *See* Farrer Decl., Ex. I (e-mail from A. Boldin to M. Huitink and W. Farrer, dated 7/6/04; stating that spreadsheet provided to Coremetrics "is vendor purchases by state during the timeframe of 6-1-03 thru 5-31-04" and that "[t]he 2nd column is the total amount of products purchased in dollars"). As noted above, "[w]here not directly controverted, plaintiff's version of the facts is taken as true for the purposes of a 12(b)(2) motion to dismiss. Likewise, 'conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiffs'] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.'" *AT&T*, 94 F.3d at 588.

[7] As noted above, the actual agreement between Coremetrics and AtomicPark contained a choice-of-law provision applying New York law "without giving effect to its conflict of laws principles." Compl., Ex. A.

As a preliminary matter, the Court acknowledges that these contacts taken individually would not be sufficient to confer general jurisdiction over AtomicPark.

First, it is true that the degree of interactiveness of a defendant's website is a factor that informs the jurisdictional analysis. *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513 (D.C. Cir. 2002) (applying sliding scale test used in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), a specific jurisdiction case, to a general jurisdiction case; under the test, at one end of the spectrum is a situation where defendant clearly does business over the Internet and so personal jurisdiction is proper, and at the other end of spectrum is a situation where defendant simply posts information on website accessible to users in foreign jurisdictions and so personal jurisdiction is not proper); *see also Lakin v. Prudential Secs.*, 348 F.3d 704, 711 (8th Cir. 2003) (stating that "consideration of the 'nature and quality' of a Web site and a determination of whether it is 'interactive,' 'does business,' or is merely 'passive' is an important factor in our analysis" of general jurisdiction); *Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd.*, 64 F. Supp. 2d 448, 451 (E.D. Penn. 1999) (agreeing that *Zippo* test may be used not only in specific jurisdiction cases but also general jurisdiction cases).

However, the fact that AtomicPark maintains a highly interactive website *by itself* would not be enough to establish general jurisdiction, as a number of courts have found. *See, e.g.*, *Estate of Stephen Bank v. Swiss Valley Farms, Co.*, 286 F. Supp. 2d 514, 518 (D. Md. 2003) ("Without evidence of actual sales made to Maryland residents, it would seem that the operation of a website that merely offers the possibility of transacting cannot be characterized as anything more than 'advertising and solicitation,' and thus is . . . insufficient for jurisdictional purposes."); *Molnlycke*, 64 F. Supp. 2d at 451 ("hold[ing] that the establishment of a website through which customers can order products does not, on its own, suffice to establish general jurisdiction" because this "would effectively hold that any corporation with such a website is subject to general jurisdiction in every state"); *Coastal Video Communications Corp. v. Staywell Corp.*, 59 F. Supp. 2d 562, 571 (E.D. Va. 1999) ("When conducting the general jurisdiction analysis, it is not enough to find that an interactive website has the potential to reach a significant percentage of the forum state's population. . . . In traditional terms, the placing of a store or salesmen in a state is not sufficient to confer general

jurisdiction over a defendant without some evidence that the store or salesman actually generated sufficient sales in the forum state for the contact to be considered continuous and systematic."); *E-Data Corp. v. Micropatent Corp.*, 989 F. Supp. 173, 176-77 (D. Conn. 1997) (rejecting plaintiff's reliance on national and international character of Internet to show that defendant's Internet advertising had potential to reach and solicit forum residents; "[i]f such potentialities alone were sufficient to confer personal jurisdiction over a foreign defendant, any foreign corporation with the potential to reach or do business with Connecticut consumers by telephone, television or mail would be subject to suit in Connecticut"); *see also* 16-108 Moore's Fed. Prac. -- Civ. § 108.44 & n.21 (citing cases in which fact of interactive website, without more, was not sufficient for general jurisdiction). The reasoning for this conclusion has generally been as follows:

> [I]t is now common for businesses of all types to have an internet website, typically with interactive capability through which customers can communicate with the business and order products. If general jurisdiction were to be predicated on these types of contacts alone, most businesses would be subject to personal jurisdiction in every forum.

*Id.*; *cf. Gorman*, 293 F.3d at 513 (emphasizing interactivity of website but stating that "determining whether Ameritrade is actually 'doing business' in the District requires an examination of the frequency and volume of the firm's transactions with District residents").

Second, the fact that AtomicPark has agreements with several third parties with offices in California would not *by itself* give rise to general jurisdiction. The Ninth Circuit has made a point of differentiating between doing business *in* California and doing business *with* California; the latter generally does not give rise to general jurisdiction "because engaging in commerce with residents of the forum state is not *in and of itself* the kind of activity that approximates physical presence within the state's borders." *Bancroft*, 223 F.3d at 1086 (concluding that defendant's license agreements with two television networks and a handful of California vendors constituted doing business with California and not in California).

Third, the fact that AtomicPark's purchases of products from California vendors, from June 1, 2003 to May 31, 2004, were in excess of $1 million (approximately 5.1 percent of its total software purchases) would not *by itself* establish general jurisdiction. In *Helicopteros Nacionales de*

United States District Court
For the Northern District of California

*Colombia, S.A. v. Hall*, 466 U.S. 408 (1984), the Supreme Court concluded that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Id.* at 418.

Fourth, the fact that AtomicPark had four Internet advertising agreements pursuant to which it agreed to personal jurisdiction in California and/or application of California law would not *by itself* be enough for general jurisdiction. In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), the Supreme Court noted that "a [choice of law] provision standing alone [is] insufficient to confer jurisdiction." *Id.* at 482; *see also Schwarzenegger*, 374 F.3d at 801 (concluding that California court did not have personal jurisdiction over defendant even though, *inter alia*, defendant had sales contracts which included a choice-of-law provision specifying California law); *Gates Learjet*, 743 F.2d at 1330-31 (finding no general jurisdiction over defendants despite several visits and purchases in forum, solicitation of contract in forum which included choice of law provision favoring forum, and extensive communication with forum); *see also Ting v. Orbit Commun. Co.*, No. 95-55838, 1997 U.S. App. LEXIS 389, at *5-6 (9th Cir. Jan. 7, 1997) (concluding that defendant's "inclusion of California choice of forum and choice of law clauses in its contracts does not warrant a finding of general jurisdiction"). Of course, in the case at bar, AtomicPark did not stipulate to personal jurisdiction in California in its contract with Coremetrics. It did so only in some agreements with other California companies.

The Court's inquiry here, however, is not limited to an analysis of each of the above contacts taken in isolation. Rather, in determining whether there is general jurisdiction, the Court looks at the totality of the contacts -- as noted above, the economic reality of AtomicPark's activities. *See Gates Learjet*, 743 F.2d at 1331. The question is whether, given this economic reality, AtomicPark could "reasonably anticipate being haled into court" in California. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Although this is a close call, the Court concludes that the economic reality of AtomicPark's activities are such that it could.

First, AtomicPark admits that it is an "e-tailer, which essentially means [it is] a retailer on line." Farrer Decl., Ex. H, at 5 (Boldin deposition); *see also* Supp. Farrer Decl. ¶ 2 (discussing

United States District Court
For the Northern District of California

purchase of software product from AtomicPark online). In other words, AtomicPark basically runs a "virtual store." A virtual store is largely designed so as to approximate physical presence in a forum; for example, consumers may window shop by browsing the website and actual sales are made directly to consumers online. Also, as is evident from AtomicPark's website (of which the Court takes judicial notice, *see* Fed. R. Evid. 201), consumers may contact AtomicPark for information and real-time assistance via the Internet or a toll-free number. In short, AtomicPark provides virtually all the same services that would be provided by a "bricks and mortar" software dealer. *Cf. Gorman*, 293 F.3d at 512-13 (concluding that defendant, a securities broker-dealer, well might have continuous and systematic contacts giving rise to general jurisdiction because of its website through which customers could open brokerage accounts online, transmit funds to accounts electronically, use accounts to buy and sell securities, borrow on margin, and pay brokerage commissions and interest; adding that defendant transmits electronic confirmations, monthly account statements, and financial and product information back to customers using e-mail and web-posting). As measured by the *Zippo* test, AtomicPark's website falls within the top end of website where the entity clearly does business over the Internet. *See Zippo*, 952 F. Supp. at 1124.

Second, AtomicPark advertises its services over the Internet, including through Yahoo, a well-known search engine. Although there is no evidence that California consumers are directly targeted through this Internet advertising, there is no evidence that they are excluded either. *Cf. Ty, Inc. v. Baby Me, Inc.*, No. 00 C 6016, 2001 U.S. Dist. LEXIS 5761, at *23 (N.D. Ill. Apr. 25, 2001) (stating that, because "'advertising on the Internet targets no one in particular and everyone,'" defendant could not "shield itself from suit by claiming that a web site which invites orders from customers in Illinois (as well as elsewhere) was not directed at Illinois residents"). At the very least, although AtomicPark may not have targeted California consumers specifically, it has reached out across the nation to promote its services.

Third, AtomicPark has actually made sales to California consumers through its virtual store, and, even more important, the volume of sales made to California consumers -- both in absolute numbers and as a percentage of total sales -- is substantial. *See Gorman, supra,* 293 F.3d at 513 (court must examine volume and frequency of transactions with forum residents); *Coastal Video*, 59

F. Supp. 2d at 572 ("As with traditional business contacts, the most reliable indicator of the nature and extent of . . . Internet contact with the forum state will be the amount of sales generated in the state by or through the interactive website."). *Compare Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir. 2002) ("Though the maintenance of a website is, in a sense, a continuous presence everywhere in the world, the cited contacts of Columbia with Texas [*i.e.*, twenty Internet subscriptions to the *Columbia Journalism Review*] are not in any way 'substantial.'"); *ESAB Group, Inc. v. Centricut*, 34 F. Supp. 2d 323, 330-31 (D.S.C. 1999) ("General in personam jurisdiction must be based on more than a defendant's mere presence on the Internet, even if it is an 'interactive' presence. Rather, the critical issue for the court to analyze is the nature and quality of commercial activity actually conducted by an entity over the Internet in the forum state. [¶] Here, . . . [t]here is no evidence showing that any South Carolina resident has visited [defendant's] web page or purchased products based on the web site advertisement."). Over a ten-month period, from April 2003 to February 2004, California consumers brought more than $3.3 million worth of products from AtomicPark, or 14.71 percent of AtomicPark's total sales. AtomicPark's president acknowledged that, from year to year, from 1999 to 2002, 14.71 percent is a representative percentage of sales to California. Therefore, the Court can reasonably infer that, from 1999 through 2003, AtomicPark earned more than $10 million, perhaps in the neighborhood of $15 million, in sales to California consumers. *Compare Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 573 (2d Cir. 1996) (noting that $ 4 million dollars in sales by defendant to forum state between 1987 and 1993, "standing alone, may not have been sufficient" to establish general jurisdiction).

The Court also notes that, although percentages are not dispositive,[8] it is still informative that the 14.71 percent in sales to California is the single largest block of sales by state. The state with the next highest percentage of sales is Texas at only 6.35 percent. Furthermore, the 14.71 percent in sales to California far exceeds the percentage of sales in other cases in which general jurisdiction

[8] *See 3M Innovative Properties Co. v. InFocus Corp.*, No. Civ. 04-0009 JNE/JGL, 2005 WL 361494, at *3 (D. Minn. Feb. 9, 2005) (noting that a defendant's percentage of sales in forum state can be a relevant consideration in a general jurisdiction analysis). *But see Lakin*, 348 F.3d at 709 (pointing out that percentage of sales is generally irrelevant because many companies do only a small percentage of sales in any one state, even though sales are worth millions of dollars).

was *not* found. *See, e.g.*, *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.*, 62 Fed. Appx. 322, 337 (Fed. Cir. 2003) (concluding that there was no general jurisdiction over defendant who made only 0.00008 percent of its sales to forum state); *Injen Tech. Co. Ltd. v. Advanced Engine Mgmt.*, 270 F. Supp. 2d 1189, 1194 (S.D. Cal. 2003) (noting that sales by defendant to forum state, which "account[ed] for only 2% of its total business, are not the kind of 'systematic and continuous' contacts that would warrant the exercise of general jurisdiction"); *Molnlycke*, 64 F. Supp. 2d at 452 (stating that "it is impossible for the court to find that the small percentage of sales [*i.e.*, less than 1 percent] constitute 'continuous and systematic business within the forum state'"); *Stairmaster Sports/Med. Prods., Inc. v. Pac. Fitness Corp.*, 916 F. Supp. 1049, 1053 (W.D. Wash. 1996) (finding insufficient contacts to justify general jurisdiction where only 3 percent of defendant's sales were made to forum state), *aff'd*, 78 F.3d 602 (Fed. Cir. 1996); *Tosco Corp. v. Sun Co., Inc.*, No. C94-4190 FMS, 1995 U.S. Dist. LEXIS 4643, at *7-8 (N.D. Cal. Apr. 5, 1995) (finding no general jurisdiction where contacts with forum state included, *inter alia*, only 0.0006 percent of total revenues for one year). Given the substantial proportion of sales made to California by AtomicPark, California as a market is central to AtomicPark's business.

Fourth, as with the volume of sales, the frequency AtomicPark's sales to California is substantial; in other words, AtomicPark's sales to California are continuous and systematic. *See Gorman*, 293 F.3d at 513 (stating that, for general jurisdiction purposes, court should consider frequency and volume of firm's electronic transactions with residents in determining whether firm "does business" with forum state). AtomicPark does not dispute that the $3.3 million in sales from April 2003 to February 2004 does not represent a single sale to a single California consumer but rather represents multiple sales to multiple California consumers. At the hearing, the parties agreed that the software products sold by AtomicPark were typically priced at or below $100. Since AtomicPark is a retailer that sells directly to individual consumers (or businesses), the $10 to $15 million of sales it has made to California represents millions of transactions. *See Gates Learjet*, 743 F.2d at 1331 (comparing continuous and systematic contacts with occasional and infrequent ones); *cf. Helicopteros*, 466 U.S. at 418 (noting substantial purchases as measured by dollars but only few transactions).

Fifth, AtomicPark's contacts with California -- *i.e.*, its sales to California consumers -- are central to its business as an e-tailer. *See Provident Nat'l Bank v. California Fed. Savings & Loan Ass'n*, 819 F.2d 434, 438 (3d Cir. 1987) (in considering defendant's contacts with forum state, asking whether contacts were central to defendant's business, which would weigh in favor of general jurisdiction). As the court noted in *Provident*,

> We find somewhat more convincing the district court's observation that the nature of California Federal's contacts with Pennsylvania respecting deposits and loans was central to the conduct of its business. In *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408 (1984), the defendant had solicited helicopter services in Texas, negotiated its contract for services there, had purchased about 80 % of its helicopters, spare parts, and accessories for more than $ 4 million from a Texas company over an eight year period, and regularly sent employees to Texas for training and to bring back helicopters. These activities were important but not central to the defendant's business, the provision of helicopter services for South American oil and construction companies. In contrast, California Federal's activities relating to Pennsylvania, the borrowing and lending of money, are the bread and butter of its daily business. It would appear that due to the nature of its contacts, California Federal would have a greater expectation of being haled into court in Pennsylvania than the Helicopteros defendant had of being haled into court in Texas.

Finally, the magnitude of AtomicPark's purchases from California and its stipulation to personal jurisdiction in California for some of its contracts with third parties -- while perhaps the least significant factors -- do inform the reasonableness of AtomicPark's expectation that it might be haled into a California court.

To summarize, even though AtomicPark's contacts with California taken individually would not sustain general jurisdiction, the Court concludes that, based on the totality of the contacts, they are sufficiently substantial, continuous, and systematic so as to support a finding of general jurisdiction.

D. <u>Reasonableness of Personal Jurisdiction</u>

Although the Court concludes that there are sufficient contacts to support general jurisdiction over AtomicPark, the assertion of general jurisdiction must still be reasonable. The test for reasonableness is the same as that used in the specific jurisdiction context, requiring an analysis of seven factors: (1) the extent of purposeful interjection, (2) the burden on the defendant to defend the suit in the chosen forum, (3) the extent of conflict with the sovereignty of the defendant's state, (4)

the forum state's interest in the dispute, (5) the most efficient forum for judicial resolution of the dispute, (6) the importance of the chosen forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum. *See Amoco*, 1 F.3d at 851. The burden is on the defendant to present a "compelling case" that the assertion of jurisdiction is not reasonable. *Id.* at 851-52.

In the instant case, AtomicPark has failed to make out a compelling case. AtomicPark has sufficiently injected itself purposefully into California's affairs through the volume and frequency of its sales to California consumers. Moreover, given the volume and frequency of sales to California consumers, California has a more than passing interest in the instant litigation.

In addition, the burden on AtomicPark in defending in California is not overwhelming or disproportionate given today's state of communications and transportation. *See Dole Food Co. v. Watts*, 303 F.3d 1104, 1115 (9th Cir. 2002) ("'Modern advances in communications and transportation have significantly reduced the burden of litigating in another country.'"); *3M Innovative*, 2005 WL 361494, at *5 ("'[P]rogress in communication and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.'"). This is particularly so in light of the fact that what is relevant in terms of burden is the *incremental* costs and inconvenience of defending suit here as opposed to Wisconsin. AtomicPark has not demonstrated that incremental cost is substantial. Furthermore, California cannot be deemed an altogether inconvenient forum for AtomicPark given its agreement to a California forum in some of its Internet advertising contracts.

AtomicPark points out that the Eastern District of Wisconsin has fewer cases and a faster average median time for resolving cases than this District. *See* Mot. at 9. But, even if true, the Court notes that the parties have in this District consented to a magistrate judge, and magistrate judges' civil and criminal caseloads often permit them to schedule cases for trial more quickly. Moreover, litigation efficiency is typically measured by where documents and witnesses are located, and in this respect Wisconsin is not a more efficient forum than California since documents and witnesses will likely be found in both states, *see Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998) ("This factor focuses on the location of the evidence and witnesses."); in fact, evidence may be more likely found in California than in Wisconsin since Coremetrics's performance

of the contract, or at least a part of it, probably took place in California. *See* Resnick Decl. ¶¶ 3-5 (discussing Coremetrics's data collection servers and aggregation servers which are located in California and Texas). AtomicPark, of course, failed to perform its part of the contract, at least based on the allegations of Coremetrics's complaint.

Finally, even AtomicPark admits that Wisconsin's sovereign interests are not greatly impacted by this lawsuit, *see* Mot. at 8 (stating that "[t]his factor has little or no bearing on the exercise of jurisdiction in this case") -- an admission borne out by the fact that the parties stipulated that New York law governs the agreement between Coremetrics and AtomicPark.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that there is personal jurisdiction over AtomicPark and therefore AtomicPark's motion to dismiss is denied.

The parties should appear before the Court on June 22, 2005, at 2:30 p.m. for a status conference. A joint status conference statement should be filed by June 15, 2005.

This order disposes of Docket No. 8.

IT IS SO ORDERED.

Dated: May 19, 2005

EDWARD M. CHEN
United States Magistrate Judge